HAWTHORNE, Justice.
This litigation arose out of a contract to build a public school building and is a concursus proceeding instituted under the provisions of R.S. 38:2243 by one of the claimants, Coburn Supply Company, for materials sold to D. L. Johnson, a subcontractor. All claimants were made parties to the suit. After trial the district judge rendered an in solido judgment in favor of James E. Caldwell Company, the contractor, against D. L. Johnson, subcontractor for all plumbing, heating, and ventilating, and the surety on Johnson’s bond, Plouston Fire &■ Casualty Insurance Company, in the sum of $6,-854.58, and dismissed the claim of D. L. Johnson against the contractor, Caldwell Company, and Caldwell’s surety, Continental Casualty Company. There was also an in solido judgment of $1,811.50 in favor of Minneapolis-Honeywell Regulator Company, a claimant, against D. L. Johnson and his surety and Caldwell and its surety, and a judgment for the same amount in favor of Caldwell and its surety on their call in warranty against Johnson and his surety. There was likewise an in solido judgment rendered in favor of Roy Yerby, a claimant, against Johnson, his surety, and the surety of Caldwell in the sum of $2,292.-98, and a judgment for the same amount in favor of Continental Casualty Company on its call in warranty against Johnson and his surety. From this judgment a suspensive and devolutive appeal was taken by Johnson and his surety, Houston. A like appeal was also taken by Caldwell and its surety, Continental.[1]
. In brief filed in this court Caldwell and Continental state that they have no complaint with the judgment as rendered, stating that they took a suspensive and devolutive appeal, however, to preclude execution by Minneapolis-Honeywell and Yerby on those portions of the judgment in their favor.
Attorneys for appellants Johnson and Houston also inform us in brief that after the rendition of the judgment appealed from Houston, surety for Johnson, paid the claims of Johnson’s job creditors, Yerby and Minneapolis-Honeywell Regulator Company, in accordance with the judgment of the trial court, and obtained a receipt and *1031 subrogation from these parties. Since this receipt and subrogation is not in the record filed in this court, we cannot render any judgment on a claim based on it. Consequently the only remaining issue on this appeal is the correctness of the judgment as between Johnson and his surety and Caldwell and its surety.
In this court appellant Johnson contends that there is a balance due him by Caldwell of $4,068.91 under his subcontract, and that he should have judgment for this amount against Caldwell and its surety. Caldwell denies that it owes Johnson any sum, but on the contrary claims that because of Johnson’s default in his subcontract it was necessary for Caldwell to incur certain costs and expenses, and that as a result of these costs and expenses Johnson and his surety are indebted to Caldwell in the sum of $6,207.82.[2]
James E. Caldwell Company, a partnership composed of James E. Caldwell and Summa Caldwell, entered into a contract in January, 1951, with the Ouachita Parish School Board for the erection of a school in West Monroe for $1,445,941.20, with Continental Casualty Company as Caldwell’s surety. The contract and the bond were recorded. Caldwell in turn subcontracted certain portions of the work to others, one of whom was D. L. Johnson, who subcontracted for all plumbing, heating, and ventilating for $222,222.22. Houston Fire & Casualty Insurance Company as surety for Johnson executed a bond in favor of Caldwell for the faithful performance of the work and payment of all claims.
A short time after the school board’s acceptance of the work as completed, Co-burn Supply Company, which had a claim for materials sold to Johnson, filed this concursus proceeding. At about this time the clerk of court’s certificate revealed that 10 liens had been filed and recorded against the work, seven of which were the liens of job creditors of Johnson. At this time the school hoard was holding a large amount of Caldwell’s contract funds, and Caldwell likewise was retaining some of Johnson’s subcontract funds. Upon Johnson’s refusal to pay the claims, as evidenced by the liens filed against him, Caldwell bonded these claims under the provisions of R.S. 9:4941, whereupon the school board released all the contract funds to Caldwell and the job claimants. All claimants were paid in full except those for or against whom judgment was later rendered by the district court, and of these both Yerby and Minneapolis-Honeywell were paid after judgment was rendered below, as we have already stated. The issue is thus left between Caldwell and its surety and Johnson and his surety.
*1033 At or about the time this suit was instituted, according to a Caldwell-Johnson statement of account filed in evidence as Caldwell Exhibit “B” (Tr. p. 104), Johnson had received from Caldwell in cash and credits, out of the $222,222.22 of his subcontract price, the sum of $194,513.25, leaving $27,708.97 as Johnson’s interest in the job. After institution of this suit but before judgment, Caldwell paid from this sum retained by him to seven of Johnson’s job creditors, who had filed liens on the work, the amount of their respective claims aggregating $24,575.07, leaving, according to this statement, to Johnson an interest in the job of only $3,133.90.
We have condensed this itemized statement as follows:
Contract Price ...............................$222,222.22
Payments by Check to Johnson ......................$191,123.58
Back Charges — Materials, Labor, Etc., Charged to This Account:
Cost of Louvers [3]. ..$2,214.83 Womack — Painting 1,162.57 Refrigerator Work 245.00 To Cover Ducts Rooms 204-206.... 67.80
Miscellaneous[4] .... 257.68
$3,947.88... $ 3 947,88
$195,071.46... $195,071.46 $ 27,150.76
Credits Due Johnson........................ $ 558.21
$ 27,708.97
Payments by Caldwell to Johnson’s Creditors ........................................ $ 24,575.07
Balance on Contract Price Retained by Caldwell ................................... $ 3,133.90
Johnson objects to the item for painting, but we find it to be covered by his' subcontract. He failed to do this work, and Caldwell had it done at its own expense. This work consisted of giving a coat of aluminum paint to all pipe that was covered by ceilings throughout the entire job, and its cost was a proper back charge, proven by Caldwell.
Johnson also says that the back charges for refrigerator work, painting, and covering ducts in Rooms 204 — 206 were not proper as they violated Section 5(1) of his contract. The provision of the subcontract relied on states that no claim for services or materials furnished the subcontractor by the contractor shall be valid unless written notice of it is given by the contractor to the sub-, contractor during the first 10 days of the calendar month following that in which the claim originated.
We do not think that this provision of the subcontract has any application to the facts of the instant case. We are convinced from the evidence adduced in this case that Johnson was in default of his subcontract, and that he failed to comply with the plans and specifications in many instances. His work was defective in numerous matters, and he failed to perform *1035 certain parts’ of the work which he was supposed to perform under the subcontract —all in spite of repeated demands by Caldwell, both verbal and written, for him to perform his subcontract according to its terms and provisions. Moreover, Johnson failed to pay his job creditors, who filed liens on the work. He was bound by his subcontract to perform the work contracted under it according to the plans .and specifications, just as Caldwell was bound in the principal contract. Upon his failure to do the work which he had engaged himself to do, it became necessary for Caldwell to do this work or have it done pursuant to its contract and to see that the cost was paid. In the performance bond given by Johnson with Houston as his surety in favor of Caldwell, Johnson bound himself to perform and complete the work according to the plans and specifications and to indemnify and save harmless the contractor against all expenses and charges arising from any act, omission, or neglect on Johnson’s part' in relation to the work and to complete the work ready for occupancy and free of all liens or claims for labor, materials, etc.
Accordingly we find that the account set out in Caldwell Exhibit “B” correctly shows a balance of..$3,133.90 retained by Caldwell as Johnson’s interest in the job.
After the rendition of the above account, Caldwell contends that because of Johnson’s default it incurred additional-costs both'in completing the work called for by Johnson’s subcontract which Johnson had not done or had not finished and also in correcting defects in the work which Johnson had performed. Caldwell itemizes these additional costs as follows:
1. Cost of correcting and/or completing . work covered by Johnson’s contract:
(a) Fans, damper, range hoods, starters, and motor ..............................$1765.64
(b) Pre-rinse assembly in cafeteria kitchen ................................. 125.00
(c) Temperature pressure relief valve on hot water tank........................ 296.54
(d) Framed operating instructions for boiler ................................... 100.00
2. Unpaid balance of F. W. Womack’s $1312.57 claim for painting............. 150.00
3. Installation of manholes...............'.... 878.44
Total ....................$3315.62
At the inception we might say that Caldwell has proven to our satisfaction that because of Johnson’s default it actually incurred and paid the items covered in the above statement designated as Items 1(a), i(c), 2, and 3, totaling $3,090.62.
It is Johnson’s contention that in particular one of these items, the installation of manholes, was not covered by his subcontract. There is no merit to this contention, as this was a part of the plumbing which he subcontracted to do. Moreover, upon his failure to do this work he was called upon 'by Caldwell pn numerous occasions in writing to do it, and so far as we can ascertain, he never at any time made the contention that this work w.as not included in his subcontract.
Johnson’s other contention is that the rest of the items have not been proven *1037 or that the proof is not sufficient for them to be allowed. As we have pointed out, Caldwell has proven certain of these items with legal certainty. Items 1(b) and 1(d), however, the pre-rinse assembly in the cafeteria kitchen amounting to $125 and the framed operating instructions for boiler amounting to $100, have not been proven with legal certainty and will be disallowed.
Caldwell sets up an additional claim as Item 4 for costs, expenses, and charges which it says it is entitled to'recover under the provision of the surety bond given by Johnson with Houston as surety that “ * * * said D. L. Johnson * * * shall pay all other expenses lawfully chargeable to said Contractor and/or Owner by reason of any fault or neglect or default of said D. L. Johnson in the relation of said agreement and said work assumed by said Subcontractor * * (Italics ours.) These costs and expenses, which are itemized, include attorney’s fees, photostats, telephone tolls, premium for Johnson’s claim bond, etc., and total $5,845.46.
Included in this total is an item designated as 10 trips of Caldwell from Abbeville to Monroe and return at $25 each, totaling $250. We find no proof in the record sufficient to allow this item. In fact, the attorney who testified as to these expenses stated that he had no personal knowledge of this charge.
As to the other items, Johnson states that they are not due because he was not in default, and he makes no contention that they are not properly chargeable if he was in default. In other words, his sole defense to the claim for these charges is that he was not at fault. As we have said, the record fully establishes that Johnson was in default in his subcontract; and this fact being established, these charges, with the exception of the item of $250, will be approved, totaling $5595.46.
Item 5 of Caldwell’s statement of. charges sets up additional expenses totaling $180.64 incurred and paid by it. These expenses have been proven to our satisfaction and will be allowed.
Caldwell is therefore entitled to recover on its claims the following:
On Items 1(a), 1(e), 2, and 3................... $30n0.62
On Item 4....................................... 5595.46
On Item 5........................................ 180.64
$8866.72
From the above total must be deducted $3,133.90, the balance of contract funds retained by Caldwell as Johnson’s interest in the job.
Caldwell is therefore entitled to judgment against Johnson and his surety in the sum of $5,732.82.
In the pleadings it is alleged and admitted that James E. Caldwell Company is a partnership composed of James E. Caldwell and Summa Caldwell. After the appeal was taken to this court, Summa Caldwell died, ■and there has been filed in this court a certified copy of a judgment of the Fifteenth Judicial District Court for Vermilion Parish *1039 ’appointing Mrs. Beulah C. Peets testamentary executrix of the estate of the deceased. Mrs. Peets, the executrix or legal representative of the deceased partner, and James E. Caldwell, the surviving partner, have on their motion been made parties to these proceedings.
For the reasons assigned the judgment appealed from in favor of James E. Caldwell Company against D. L. Johnson and Houston Fire & Casualty Insurance Company is amended by reducing the amount of the award from $6,854.58 to $5,732.82, and as thus amended the judgment is affirmed. All costs of this appeal are to be paid by James E. Caldwell Company.

. Yerby obtained an order of appeal but never perfected it Minneapolis-Honeywell did not appeal.

. The Judgment in this ease in favor of Caldwell and its surety and against Johnson and his surety was in the amount of $6,854.58, or $646.76 more than the amount sought by Caldwell in the lower court and in brief filed in this court.

. This back charge is conceded to be correct.

. There is no dispute as to the cost of the items included in this back charge. They are made up almost entirely of the cost of concrete foundations and are conceded to be properly back charged.